966 F.2d 1451
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Elmer CARMEN, Plaintiff-Appellant,
v.
GOULD INC., Defendant-Appellee.
Westinghouse Electric Corporation, Defendant.
 No. 91-3383.
 United States Court of Appeals, Sixth Circuit.
 May 7, 1992.
 
 Before MILBURN and RYAN, Circuit Judges and HOOD, District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 Plaintiff Elmer Carmen appeals the district court's order granting summary judgment for defendant Gould Inc. in Carmen's age discrimination and breach of contract suit against Gould. In addition to state and federal age discrimination claims, Carmen raises issues of promissory estoppel, fraud, and negligent infliction of emotional distress. We think the district court correctly granted summary judgment as to all of Carmen's claims.
 
 I.
 
 2
 Carmen's claims arise from the loss of his job when Gould sold the division in which he was employed to Westinghouse Electric Corporation. Carmen was born in 1926 and began working for Gould in 1956. In 1984, Gould promoted Carmen to Vice President-Contracts for the Ocean Systems Division (OSD). OSD employed over 1100 people, and was a contractor for the U.S. Navy.
 
 
 3
 During 1984-85, Gould changed its pension plan for the purpose of reducing benefits paid to long-term employees. As part of the change, Carmen received a salary increase. In a letter explaining the changes, Gould informed Carmen:
 
 
 4
 It is very important that you understand the basis and intent of this special adjustment. It is designed to increase your pension by increasing your base salary until you retire and also provide additional funds to save toward retirement. The Company strongly recommends that you consider investing these funds....
 
 
 5
 The Company by this unusual salary action combined with the new pension plan is providing you the opportunity to earn and build a retirement income that will achieve parity with the previous pension plan.
 
 
 6
 Carmen attested that at seminars explaining the change, "I was told that if I invested the amount of my salary adjustment ... until my normal retirement age of sixty-five, the sum accrued as a result of that investment would offset any shortfall occasioned by the changes in the benefit plan."
 
 
 7
 In 1987, Wayne Snodgrass became the general manager of OSD, and Carmen's immediate supervisor. Carmen's co-workers attested that while general manager, Snodgrass "frequently repeated his desire to get rid of older employees to reduce costs and open career paths for younger people," and "expressed some frustration over the fact that he couldn't trim these older employees from the Company and that this inability resulted in his losing good, young employees."
 
 
 8
 In 1987, Gould began negotiating with Westinghouse to sell OSD. Walter Jackson, an executive with Gould at that time, stated that during the negotiations, Westinghouse's general manager, Walt Dunkel, told Snodgrass that "the asset purchase was an opportunity for Snodgrass to not take some selected older employees over the threshold to Westinghouse by failing to extend an offer of employment after the completion of the sale."
 
 
 9
 Carmen contends that this understanding caused Gould and Westinghouse to amend the asset purchase agreement. A January 1988 draft of the asset purchase agreement included a section which read:
 
 
 10
 Buyer shall offer employment to all active employees of the Division in similar capacities and upon comparable terms and conditions as such each active employee was employed as of the Closing Date....
 
 
 11
 In a February 1, 1988 draft, the relevant section was changed:
 
 
 12
 Buyer shall offer employment on the Closing Date to all active employees of the Division ... except for not in excess of one percent (1.0%) of such active Division employees whose names will be provided to Seller at the Closing and who will continue at the Closing Date to be employees of Seller.
 
 
 13
 One percent of 1100 employees is eleven employees.
 
 
 14
 Gould and Westinghouse closed the sale on March 2, 1988. At the time of the closing, Westinghouse gave Gould a list of eleven OSD employees it chose not to hire. Carmen was on that list. After Gould sold OSD, none of the positions that the eleven occupied still existed at Gould. Of these eleven employees, one applied for and received another position at Gould. Gould discharged Carmen and the other nine employees. Of the ten discharged employees, at least nine were over forty.
 
 
 15
 Gould discharged Carmen on March 2, 1988, the date that the OSD sale was finalized. On that date, Snodgrass and Ralph Lightner, then the Vice President-Human Resources for Gould, met with Carmen in Snodgrass' office. Snodgrass informed Carmen that his employment was being terminated and ordered Carmen to leave the building that day. Later, a security guard appeared at Carmen's office, instructed Carmen to pack his belongings, and escorted him from the building. Subsequently, in a May 23, 1988 letter, Lightner informed Carmen that his "termination date from Gould will be May 31, 1988," and that he would receive severance pay, at his existing base salary, until June 30, 1989. Carmen stated that he received this severance pay.
 
 
 16
 After the sale of OSD, Westinghouse filled Carmen's former position with Linda Susie, a woman younger than Carmen.
 
 
 17
 In June 1989, Carmen filed a seven-count complaint against Gould and Westinghouse. The complaint included claims charging wrongful discharge based on violations of the ADEA and Ohio's age discrimination statute. The complaint also included claims alleging breach of contract, fraud, and negligent infliction of emotional distress. In May 1990, the district court found the state law claims within its pendant jurisdiction and dismissed two state claims with leave to refile. In June 1990, Carmen filed an amended complaint.
 
 
 18
 On April 5, 1991, the district court granted summary judgment to Gould on all claims, but denied summary judgment to Westinghouse. Later in April, Carmen settled with Westinghouse.[1] On April 8, the district court accepted a stipulation from Carmen and Westinghouse and ordered that claims against Westinghouse be dismissed. On April 24, Carmen filed a notice of appeal of the district court's April 5 order.[2] The district court filed its memorandum opinion on May 14, 1991.
 
 II.
 A.
 Standard of Review
 
 19
 This court's review of a grant of summary judgment is de novo, and uses the same test as the district court. EEOC v. Univ. of Detroit, 904 F.2d 331, 334 (6th Cir.1990). This court will find that summary judgment was properly entered
 
 
 20
 if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact....
 
 
 21
 Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988).
 
 
 22
 Of course, "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the parting opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citation omitted). The movant meets its initial burden "by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986). At that point, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).
 
 B.
 Age Discrimination
 
 23
 Carmen alleges that Gould's conduct violated both federal and Ohio age discrimination statutes. The relevant federal statute provides:
 
 
 24
 It shall be unlawful for an employer--
 
 
 25
 (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age....
 
 
 26
 29 U.S.C. § 623(a). The relevant Ohio statute reads:
 
 
 27
 No employer shall discriminate in any job opening against any applicant or discharge without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job and laws pertaining to the relationship between employer and employee.
 
 
 28
 O.R.C. § 4101.17(A). Although the language in the two sections is not identical, we need not analyze Carmen's state and federal claims separately because, as we previously noted, "[t]he Ohio Supreme Court has held that the elements and burden of proof in a state age discrimination claim are the same as in a federal case." McLaurin v. Fischer, 768 F.2d 98, 105 (6th Cir.1985).
 
 
 29
 In Barnes v. Gencorp Inc., 896 F.2d 1457 (6th Cir.1989), cert. denied, 111 S.Ct. 211 (1990), this court faced a claim very similar to this one, in which a group of plaintiffs were discharged after a corporate reorganization. The opinion in Barnes comprehensively analyzed the law of this circuit pertaining to age discrimination, and we draw heavily on Barnes for the analysis in this case. Barnes reiterated that this court uses the three-step analytical method established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to examine claims of employment discrimination:
 
 
 30
 First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.
 
 
 31
 Barnes, 896 F.2d at 1464 (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)). In McDonnell Douglas, the Court also discussed the elements a plaintiff must show to prove the first of the three steps, the prima facie case, in the absence of direct, circumstantial, or statistical evidence. McDonnell Douglas established a four-part test that plaintiffs may use:
 
 
 32
 The McDonnell Douglas test requires a plaintiff to show the following in order to establish a prima facie case: (1) that he is a member of a protected class; (2) that he applied for a job and was rejected; (3) that he was qualified for the job; and (4) that the employer continued to seek job applicants after the plaintiff was rejected.
 
 
 33
 Barnes, 896 F.2d at 1464 n. 6. This court has used the McDonnell Douglas test to evaluate a claim of age discrimination in the discharge of the employee:
 
 
 34
 In adapting the McDonnell Douglas test to a discharge case in which the plaintiff alleges age discrimination, a plaintiff would be required to demonstrate that:
 
 
 35
 (1) he was a member of the protected class [i.e., age-40-and-over];
 
 
 36
 (2) he was discharged;
 
 
 37
 (3) he was qualified for the position;
 
 
 38
 (4) he was replaced by a younger person.
 
 
 39
 Id. at 1465 n. 9. (insert in original). A plaintiff who proves all four elements, will have successfully carried his burden to prove a prima facie case. Barnes, however, held that a plaintiff need not show all four elements: "We have stated that the McDonnell Douglas test is not to be applied mechanically, instead opting for a case-by-case approach that focuses on whether age was in fact a determining factor in the employment decision." Id.
 
 
 40
 In addition to adapting McDonnell Douglas for an age discrimination case, this court has also modified the McDonnell Douglas test for cases involving a reduction in force (RIF). "A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company." Barnes, 896 F.2d at 1465. In a RIF case, the plaintiff would be able to prove only parts (1)-(3) of the McDonnell Douglas test--due to the RIF, the discharged plaintiff would not have been replaced. By showing only elements (1)-(3),
 
 
 41
 a plaintiff has not presented any evidence indicating that the work force reductions are not the reasons for the discharge and therefore does not make out a prima facie case absent additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.
 
 
 42
 Barnes 896 F.2d at 1465. Thus, in a RIF situation, the plaintiff faces a higher burden:
 
 
 43
 The mere termination of a competent employee when an employer is making cutbacks due to economic necessity is insufficient.... The plaintiff in such reorganization cases must come forward with additional direct, circumstantial, or statistical evidence that age was a factor in his termination.
 
 
 44
 LaGrant v. Gulf & Western Mfg. Co., 748 F.2d 1087, 1090 (6th Cir.1984) (citations omitted).
 
 
 45
 In the present case, Carmen did not show the fourth element of the McDonnell Douglas prima facie analysis, that Gould replaced him with a younger person. While Westinghouse may have replaced him with a younger person, Gould did not. Therefore, to prove his prima facie case, Carmen is left with only direct, circumstantial, or statistical means.
 
 
 46
 Carmen argues that he has brought forward both direct evidence and statistics sufficient to prove that Gould discriminated based upon age. Gould notes that of the employees discharged by Gould, nine of ten were over forty. Gould also directs this court to the comments allegedly made by general manager Snodgrass.
 
 
 47
 Without finding that this evidence sufficiently proves a prima facie case of age discrimination, we assume, for the purpose of this analysis, that Carmen has made out a prima facie case of age discrimination. The next step in the McDonnell Douglas analysis shifts the burden to Gould to articulate a legitimate, nondiscriminatory reason for discharging Carmen. Gould states that Carmen was discharged because his position no longer existed at Gould. Westinghouse bought OSD; therefore, Gould no longer had a position for a vice president of contracts for OSD.
 
 
 48
 The third and final step in the McDonnell Douglas analysis gives Carmen the opportunity to prove that Gould's explanation for discharging Carmen is pretextual. We think Carmen fails to make the necessary showing. In order to show that the reason for his discharge was pretextual, Carmen must show that the sale of OSD was a pretext. This he obviously cannot do: Gould did not sell a division worth millions of dollars, and employing over a thousand people, merely to eliminate the jobs of ten older employees. Carmen's claim of direct age discrimination against Gould fails.[3]
 
 
 49
 Carmen's only remaining argument is that Gould is somehow liable for violating the ADEA because it assisted Westinghouse to engage in discriminatory hiring. Carmen points specifically to the change in the sales agreement which allowed Westinghouse to terminate one percent of OSD's workforce. Although Carmen does not use the term "civil conspiracy" to describe this claim, a civil conspiracy is essentially what he alleges.
 
 
 50
 The district court addressed this argument and noted that the only evidence supporting the claim was the conversation between Snodgrass and Dunkel during which Dunkel allegedly advised Snodgrass that the sale of OSD would be a good opportunity for Snodgrass to eliminate older employees. The district court concluded that "this evidence is insufficient as a matter of law to show the existence of genuine issue of material fact as to whether a conspiracy existed between Westinghouse and Gould." We agree.
 
 
 51
 Carmen has provided no proof that Gould committed any overt act to aid Westinghouse in Westinghouse's decision to not hire Carmen. Joseph Huss, Gould's Vice President of Human Resources after Lightner, attested that "Westinghouse was solely responsible for selecting the eleven employees they did not hire. Gould played no part in Westinghoues's [sic] selection of those persons Westinghouse chose not to hire." In his own deposition, Carmen testified that he had no knowledge whether Gould had any input into Westinghouse's decision not to hire him.
 
 
 52
 We conclude that the district court did not err by granting summary judgment to Gould. Carmen failed to create a genuine issue of material fact as to whether Gould's reason for discharging him was pretextual and whether Gould had any input into Westinghouse's decision not to hire him.
 
 B.
 Breach of Contract
 
 53
 Ohio law governs Carmen's breach of contract claim. Initially, we note that Carmen was an at-will employee of Gould because he had neither a written nor an oral contract of employment. Carmen argues, however, that Gould lacked the right to discharge him because of the promissory estoppel exception to the employment-at-will doctrine.
 
 
 54
 In Helmick v. Cincinnati Word Processing, Inc., 45 Ohio St.3d 131 (1989), the Ohio Supreme Court recognized such an exception, noting: "A demonstration of detrimental reliance on specific promises of job security can create an exception to the employment-at-will doctrine." Syllabus, p 3. This exception has two distinct elements: 1) specific promise; and 2) detrimental reliance.
 
 
 55
 In Wing v. Anchor Media, 59 Ohio St.3d 108 (1991), the court expanded on both elements of the exception in a case both factually and procedurally similar to this case. In Wing, the court affirmed a grant of summary judgment against a radio station manager who alleged that the language of an employee handbook and the promise of equity participation in the station constituted a promise of future employment. As to the promise of equity participation, the court noted:
 
 
 56
 Although Wing may have thought that the promise of a future opportunity to buy into the station meant job security, such a promise is not a promise of continued employment and, therefore, cannot reasonably be relied upon as such. Rather, such a promise is, at best, a promise relating to career development. Accordingly, we hold that a promise of future benefits or opportunities without a specific promise of continued employment does not support a promissory estoppel exception....
 
 
 57
 Id. at 110-11. As to whether there was detrimental reliance, the court said: "[M]erely turning down other employment inquiries does not present a jury question of substantial detrimental reliance." Id. at 111.
 
 
 58
 In this case, Carmen failed to produce any evidence of a specific promise of employment. The statements made by Gould to Carmen regarding the pension plan change did not constitute a specific promise of employment until Carmen reached 65. Rather, the statements were made as a suggestion that the salary increase should be invested in order to ensure equivalent retirement income. As such, they are similar to the promise of future benefit at issue in Wing, a promise that failed to support the application of the promissory estoppel exception.
 
 
 59
 Further, even if the statements were a general promise of continued employment, they did not amount to a specific promise of employment that would apply to a situation where Carmen's position was eliminated. The district court held that Gould's statements to Carmen "could not be construed as a promise that plaintiff would remain with Gould even if the entire division in which plaintiff worked was eliminated or sold." This holding accords with Ohio law. In Hoops v. United Telephone Co. of Ohio, No. WD-87-62, 1988 WL 88773, 1988 Ohio App. LEXIS 3457 (Aug. 26, 1988), the Ohio Court of Appeals held that a plaintiff's promissory estoppel claim failed in a RIF situation:
 
 
 60
 Appellant's job was eliminated, and he subsequently selected early retirement, pursuant to a reduction in appellee's work force. Appellant has not set forth evidence of any representations by appellee which could have led him to believe that he would remain employed regardless of appellee's financial status.
 
 
 61
 Id. at 1988 WL 88773 at * 4, 1988 Ohio App. LEXIS 3457, * 11.
 
 
 62
 Because Carmen has not demonstrated that Gould gave him a specific promise of continued employment, the district court properly granted summary judgment to Gould on this claim.
 
 C.
 Fraud
 
 63
 This claim arises from Gould's statements in 1985 suggesting that if Carmen were to invest his salary increase until he reached normal retirement age, then the pension plan change would not affect his retirement income. Carmen argues that these statements constituted fraud because they formed a promise that Gould would employ him until age 65, and Gould did not intend to employ him until age 65. This argument merely restates Carmen's position regarding the breach of contract claim.
 
 
 64
 The discussion above demonstrated that Carmen proved no such promise of continued employment. The examples and illustrations regarding his pension were merely suggestions and advice, not promises.
 
 
 65
 As to the statements themselves, Carmen does not demonstrate that a genuine issue of material fact exists about their fraud. He did not show that the statement about accruing the same retirement income from investing was false, nor did he show that at the time the statements were made, Gould knew they were false.
 
 
 66
 The district court properly granted summary judgment to Gould on the fraud claim.
 
 D.
 Negligent Infliction of Emotional Distress
 
 67
 Carmen alleges that the manner in which Gould discharged him was humiliating, and that this treatment caused him to experience emotional harm. Carmen argues that this conduct constitutes negligent infliction of emotional distress.
 
 
 68
 While Ohio recognizes a claim for inntional infliction of emotional distress, Ohio does not recognize a cause of action for negligent infliction of emotional distress in an employment context. Carmen concedes that the Ohio Supreme Court has not recognized the negligent infliction of emotional distress, but contends that neither has it rejected this tort. Nevertheless, the Ohio Court of Appeals recently held:
 
 
 69
 Ohio courts do not recognize a separate tort for negligent infliction of emotional distress in the employment context. Consequently, plaintiff may recover for emotional harm negligently inflicted by defendant only by bringing a "traditional" claim for negligent infliction of emotional distress, which requires plaintiff to show that he (1) was a bystander to an accident, (2) reasonably appreciated the peril thereof, and (3) suffered serious and foreseeable emotional distress as a result of his cognizance or fear of the peril.
 
 
 70
 Hatlestad v. Consolidated Rail Corp., No 91AP-343, 1991 WL 224534, at * 4, 1991 Ohio App. LEXIS 4143, at * 13-14 (Franklin Co. Aug. 29, 1991) (citations omitted). This court may not recognize a new tort cause of action where Ohio appellate courts have expressly declined to do so.
 
 
 71
 Even if Ohio would recognize Carmen's cause of action, the facts of this case do not indicate that Gould acted in an outrageous manner. Accepting as true all of Carmen's allegations, the circumstances of his discharge were that he met privately with Snodgrass and Lightner, they informed him, without using profanity, that he was being discharged and ordered him to leave the building that day. A security guard then observed Carmen the rest of that day. This is not outrageous conduct.
 
 
 72
 The district court properly granted summary judgment to Gould on the negligent infliction of emotional distress claim.
 
 III.
 
 73
 The district court's grant of summary judgment is AFFIRMED.
 
 
 
 *
 The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 Westinghouse, therefore, is not a party to this appeal
 
 
 [2]
 In his notice of appeal, Carmen stated that he was appealing the district court's order of April 5, 1991. This order is not a final order under Fed.R.Civ.P. 54(b) because it only adjudicated Carmen's claims against Gould, not Westinghouse. Carmen's notice of appeal is thus defective, and would normally fail to give this court jurisdiction. Nevertheless, in this case, judgment became final prior to the filing of the notice of appeal when the district court entered its order on April 8, 1991 dismissing the remaining claims against Westinghouse
 In this circumstance, this court does possess jurisdiction. As we held in Gillis v. Department of Health & Human Services, 759 F.2d 565, 569 (6th Cir.1985):
 [W]e are presented with the question of whether a premature notice of appeal is effective to vest this Court with jurisdiction where the remaining elements of the case have been finally disposed of but no new notice of appeal has been filed.
 ... Although we do not condone plaintiffs' sloppy practice, we conclude that we have jurisdiction to consider the appeal in this instance.
 We find that Gillis applies here, and conclude that we possess jurisdiction over this appeal.
 
 
 [3]
 In reality, this is not a case of discriminatory discharge at all; rather, it is a case of discriminatory hiring which arose when Westinghouse refused to hire Carmen in his former position and proceeded to hire a younger person in his place. These facts do create genuine issues of fact as to whether Westinghouse engaged in discriminatory hiring. The district court undoubtedly recognized this when it denied summary judgment to Westinghouse