**Estate of Mervin M. JAYCOX, et al., Plaintiffs–Appellants,**

v.

**SETTY FAMILY VETERANS RESIDENTIAL CARE HOME; United States of America, Defendants–Appellees.**

No. 02–4213.

United States Court of Appeals, Sixth Circuit.

May 24, 2004.

Steve J. Edwards, Grove City, OH, for Plaintiffs–Appellants.

George A. Lyons, Columbus, OH, Jan M. Holtzman, U.S. Attorney's Office, Cincinnati, OH, for Defendants–Appellees.

Before BOGGS, Chief Judge; GUY, Circuit Judge; and HOOD, District Judge.[*]

BOGGS, Chief Judge.

Mervin Jaycox, an elderly veteran, died after falling from the balcony that was adjacent to his second-floor room at his residential care home. His estate ("Estate") sued both the Setty Family Veterans Residential Care Home ("Setty Home") and the United States Department

---

[*] The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

of Veterans Affairs ("VA") under Ohio law and the Federal Tort Claims Act ("FTCA"). 28 U.S.C. §§ 2671 et seq., claiming that the defendants' negligence was the proximate cause of Jaycox's death. The district court granted summary judgment for both defendants, and the Estate now appeals.[1] We affirm.

## I

Mervin Jaycox (age sixty-nine) was a veteran of the United States Armed Forces. He and his wife lived together in Harrisburg, Ohio until March 1996, when she suffered a stroke that required her to move into a nursing home. Because his wife could no longer care for him, Jaycox contacted Charles Hodges, a social worker with the VA, to help him find new housing. Hodges referred him to Robert Brandyberry, a social worker with the VA Community Residential Care Program ("CRC")—a program that helps eligible veterans obtain placement in privately owned homes that offer assisted living services.

The CRC was enacted pursuant to 38 U.S.C. § 1730. It is governed by a handbook ("Handbook") that describes the details of the program, along with the duties and responsibilities of the VA and the veterans. Among other things, the Handbook explains that, to be eligible, veterans must not require hospital or nursing home care. One particularly relevant provision states:

1.02[ (a) ]   Definitions.

CRC provides health care supervision to eligible veterans not in need of hospital or nursing home care but who, because of medical and/or psychosocial health conditions as determined through a statement of needed care, are not able to live independently and have no suitable family or significant others to provide the needed supervision and supportive care. The veteran must be capable of self-preservation with minimal assistance and exhibit socially acceptable behavior. Care will consist of room, board, assistance with activities of daily living and supervision as determined on an individual basis. *The cost of care is financed by the veteran's own resources. Placement is made in residential settings inspected and approved by the appropriate medical center but chosen by the veteran.*

J.A. 56 (emphasis added).

Brandyberry proceeded to determine whether Jaycox would be eligible for the CRC program by reviewing his medical history and gathering information from Jaycox and his two children, Stephen Jaycox and Sandra Martsoff. The medical records revealed that Jaycox had a history of stroke, seizure, short-term and long-term memory impairment, visual impairment, and mobility restrictions. Jaycox also walked with a cane. Brandyberry concluded that Jaycox complied with the eligibility requirements. He completed a written assessment of Jaycox indicating that although he would need assistance with mobility, he was capable of "self-preservation with minimal assistance."

In May 1996, Jaycox moved into Setty Home and took up residence on the second floor. This room had direct access to a balcony that served as a fire escape. Given his limited mobility, both Brandyberry and Jaycox would have preferred to find housing on the first floor of a residential care home. Brandyberry testified, however, that there were no first-floor rooms available within the geographical restrictions imposed by Jaycox. Jaycox had pre-

1.   By consent of the parties, the case was referred to United States Magistrate Judge Terence P. Kemp pursuant to 28 U.S.C. § 636(c).

viously indicated that he wanted to be located close to his wife's nursing home. Although there is some dispute about who made the final decision as to where Jaycox would live, it is undisputed that Jaycox's residence in Setty Home was voluntary.

According to Brandyberry's deposition, Jaycox agreed to the placement at Setty Home with the understanding that the VA would continue to look for a first floor placement elsewhere. In addition, Brandyberry explained that Jaycox's placement in Setty Home was conditioned upon his ability to negotiate the stairs, and that Jaycox agreed that he could do so. Jaycox was also instructed by Setty Home to stay off the balcony unless there was a fire drill or an emergency.

Jaycox quickly became dissatisfied with his living conditions, presumably because his wife had taken better care of him. On June 17, 1996, Jaycox was admitted to the nearby VA Medical Center. He remained at the hospital for ten days while undergoing treatment and various examinations. While at the hospital, Jaycox continued to complain of his living situation at Setty Home. The hospital discharged Jaycox on June 27, following a thorough examination. The physician concluded that Jaycox was "competent for VA purposes," though the exact meaning of that phrase is unclear. After Jaycox was discharged, his children persuaded him to return to Setty Home until other arrangements could be made.

While Jaycox was at the hospital, VA employee Glen Schmidt evaluated him and completed a "Social Work High Risk Screening Profile." After reviewing all of the information, Schmidt wrote: "Planning: probably return to placement [Setty Home] but acceptance is questioned. He is 'At Risk' per VA criteria." The Estate alleges that this assessment represents "a party opponent admission that the placement of Mervin Jaycox in the CRC [was]

questionable." As the magistrate judge noted, however, there is nothing in the record that explains what "At Risk" means.

Jaycox returned to Setty Home on June 27, but he continued to be unhappy about his living conditions. On July 12, Brandyberry went to Setty Home to meet with him and discuss his concerns. According to Brandyberry (the only source for this conversation), Jaycox was extremely angry about the living conditions and the care he had received at Setty Home. He also claimed that he had found other living arrangements and was going to leave Setty Home soon. After a half-hour or so, Brandyberry said he wanted to call Jaycox's son, Stephen, to confirm these new plans. At that point, Jaycox walked out on the balcony. Even though Brandyberry claimed Jaycox had calmed down considerably by then, Brandyberry asked if he would be all right on the balcony and Jaycox responded that he would. Brandyberry eventually left the room to call Stephen. While he was gone, Jaycox either fell or jumped off the balcony to his death.

The Estate subsequently sued both the VA and Setty Home. It alleged that the defendants were negligent in placing Jaycox in a second-floor room with access to the balcony, and that the VA (Brandyberry) was negligent for leaving him alone on the balcony. The defendants filed for summary judgment alleging that neither the VA nor Setty Home had a legal duty to protect Jaycox from the dangers inherent in the second-floor balcony, which was an "open and obvious hazard" under Ohio law. The district court agreed and found that, as a matter of law, neither defendant had a duty to protect or warn Jaycox about the dangers posed by the balcony. The Estate appealed timely.

## II

We review de novo a district court's grant of summary judgment, using the same standard under Federal Rule of Civil Procedure 56(c) used by the district court. *Williams v. Mehra,* 186 F.3d 685, 689 (6th Cir.1999) (en banc). The Estate sued Setty Home under Ohio law and sued the VA under the FTCA, 28 U.S.C. §§ 2671 *et seq.* Pursuant to the FTCA, the VA can be liable "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place [*i.e.,* Ohio] where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Thus, because both claims are governed by Ohio's general negligence law, that is the law we must apply.

To establish a claim for negligence in Ohio, a plaintiff must show the "existence of a duty, a breach of the duty, and an injury resulting proximately therefrom." *Menifee v. Ohio Welding Prods.,* 15 Ohio St.3d 75, 472 N.E.2d 707, 710 (1984). The district court granted summary judgment after finding that, as a matter of law, the defendants had no *duty* to protect Jaycox from, or warn him of, the dangers inherent in the balcony. Because the Estate's claims could not meet the first requirement for establishing negligence, the court found that no genuine issue of material fact existed.

"The existence of a duty in a negligence action is a question of law for the court to determine." *Mussivand v. David,* 45 Ohio St.3d 314, 544 N.E.2d 265, 270 (1989). The Ohio Supreme Court has explained that "[t]he existence of a duty depends on the foreseeability of the injury." *Menifee,* 472 N.E.2d at 710. *See also Jeffers v. Olexo,* 43 Ohio St.3d 140, 539 N.E.2d 614, 616–17 (1989) ("Whether a duty exists depends largely on the foreseeability of the injury to one in the plaintiff's position. . . . Only when the injured person comes within the circle of those to whom injury may reasonably be anticipated does the defendant owe him a duty of care.") (internal quotations omitted). Thus, the precise question before us is whether either defendant should have anticipated that placing Jaycox in the second-floor room with the balcony, or leaving him on that balcony alone, was likely to have resulted in the injury he suffered.

On appeal, the Estate has attempted to expand its claim by arguing that it was negligent for the VA even to have admitted Jaycox into the CRC in the first place in light of his medical problems. A thorough review of the record below indicates that the Estate did not raise this particular argument below. All of the Estate's arguments below, which did reference Jaycox's ailments and the defendants' knowledge of those ailments, were intended to show that Jaycox's medical condition should have prevented the defendants from placing Jaycox in the second-floor room. For example, in its memorandum opposing summary judgment, the Estate explained:

Plaintiff is alleging the following acts of negligence:

a. The VA's *placement* of Mervin Jaycox in the Setty Family Home

b. The VA's leaving Mervin Jaycox on the balcony unassisted and without his cane after a heated argument, just prior to his death . . .

c. The Setty Home in accepting Mervin Jaycox into their home and placing him in a second floor room with access to a balcony and fire escape.

J.A. 231 (emphasis added).

Clearly, the Estate is not arguing here that the VA's mere acceptance of Jaycox into the CRC was negligent. Later in this same memorandum, the Estate added: "In order to discuss proximate causation, it must already have been determined that

Defendants owed Mervin Jaycox a duty and that duty had been breached. Therefore, Defendant VA must be negligent in placing Mervin Jaycox in this *particular room* and or leaving him on the balcony...." J.A. 235 (emphasis added). Likewise, the Complaint stated that "[d]efendants were negligent in the *care and housing* of Mervin Jaycox, including, but not limited to placing [Jaycox] in a room with unrestricted access to the balcony." J.A. 9 (emphasis added). Thus, it is clear that the Estate's arguments related to the *placement* of Jaycox into this particular room. Accordingly, the district court focused on this issue, and did not discuss the issue of whether the mere acceptance into the CRC was negligent. Because this issue was not raised below, we decline to pass on it for the first time on appeal. *See Noble v. Chrysler Motors Corp., Jeep Div.,* 32 F.3d 997, 1002 (6th Cir.1994).

Thus, the question before us is whether a duty arose because the defendants should have foreseen that either the placement of Jaycox in the second-floor room, or the VA's (i.e., Brandyberry's) decision to leave Jaycox alone on the balcony, was likely to result in the injury Jaycox suffered. If so, then a duty would exist under Ohio law. We consider each allegation in turn.

### A

■ As stated earlier, "[u]nder Ohio law the existence of a duty depends on the foreseeability of the injury." *Littleton v. Good Samaritan Hosp. and Health Ctr.* 39 Ohio St.3d 86, 529 N.E.2d 449, 455 (1988). However, Ohio courts have consistently found that there is no duty to warn about "open and obvious" hazards. *Simmers v. Bentley Constr. Co.,* 64 Ohio St.3d 642, 597 N.E.2d 504, 506 (1992). "The rationale behind the doctrine is that the open and obvious nature of the hazard itself serves as a warning. Thus, the owner or occupier may reasonably expect that persons entering the premises will discover those dangers and take appropriate measures to protect themselves." *Ibid. See also Anderson v. Ruoff,* 100 Ohio App.3d 601, 654 N.E.2d 449, 451 (1995) ("[T]he 'open and obvious' doctrine is still good law.").

The balcony in question is clearly an open and obvious hazard. *See Prest v. Delta Delta Delta Sorority,* 115 Ohio App.3d 712, 686 N.E.2d 293, 295–96 (1996) (holding that roof of sorority house was an open and obvious hazard after intoxicated student fell off roof and died). The Estate is not alleging that the balcony was defective, but only that Jaycox should not have been placed in a room with direct access to it. Thus, neither defendant owed any duty of care to Jaycox with respect to the dangers posed by the balcony.

We note that *Simmers* applied the open and obvious hazard doctrine to injuries sustained by invitees on an owner's property. Ohio courts have also, however, applied this doctrine to negligence claims raised by tenants against landlords. *See, e.g., Hart v. Dockside Townhomes, Ltd.* No. CA2000–11–222, 2001 WL 649763, 2001 Ohio App. LEXIS 2608, at *4 (Ohio Ct.App. June 11, 2001) ("[A landord] is under no duty, however, to protect a person from known dangers or dangers which are so obvious and apparent that the person should reasonably be expected to discover them and protect himself from them."); *Howson v. Amorose,* No. 00AP–8, 2000 WL 1753112, 2000 Ohio App. LEXIS 5542, at **10–11, **13–15 (Ohio Ct.App. Nov. 30, 2000) (holding that tenant in apartment complex could not sue for injury because pothole in parking lot was open and obvious); *Balogh v. Goldstein Props.,* No. 76196, 2000 WL 573194, 2000 Ohio App. LEXIS 2032, at *12 (Ohio Ct.App. May 11, 2000) (" '[W]here the hazard is

'open and obvious,' there is no duty to warn of the danger.").

These cases provide support for our conclusion in that Jaycox's relationship to the Setty Home is very analogous to a landlord-tenant relationship.˙ The VA, by contrast, cannot be analogized to a landlord so easily. Still, the rationale behind the open and obvious hazard doctrine makes it clear that the VA had no duty to Jaycox either, with respect to the danger of the balcony. Again, the existence of a duty depends on foreseeability. The rationale behind the open and obvious doctrine is that the hazard's very nature provides warning of the danger. Thus, it was not foreseeable to the VA that Jaycox would have likely been injured by such an open and obvious hazard. Because there was no foreseeability, there was no duty.

We add that it seems strange to argue that Jaycox was endangered by a balcony that served as a fire escape. If a fire had broken out, it would have been better for Jaycox (who has mobility problems) to have had direct access to a balcony. If anything, the balcony made Jaycox safer.

■ Although the open and obvious hazard doctrine resolves the question with respect to both defendants, we address briefly the Estate's argument that it was still foreseeable that Jaycox would have been injured. First, Jaycox's decision to live at Setty Home was voluntary and he was competent to make that decision. In separate depositions, both of Jaycox's children conceded that their father was competent to make the decision to move into Setty Home. Second, there is the issue of control. Because the choice to live at Setty Home was completely voluntary, and because Setty Home (and the CRC more generally) required its residents to be capable of self-preservation, neither the VA nor Setty Home exerted any control over Jaycox himself, or over his decision to

move in. In short, the Estate simply has not met its burden of establishing a duty. The balcony was an open and obvious hazard, and the Estate cannot establish a disputed issue with respect to foreseeability given Jaycox's competence, consent, and the defendants' lack of control over him.

B

■ The Estate also claims that it was negligent for the VA (acting through Brandyberry) to have left Jaycox out on the balcony alone. For reasons stated above, the open and obvious hazard doctrine acts as a bar to this claim as well. There are, however, other reasons for rejecting this argument as well. First, unlike the claim above in which the Estate is suing on the basis of the defendants' act of placing Jaycox in the second-floor room, this claim faults the VA for not acting affirmatively. In other words, the Estate argues that the VA should have taken some action such as staying with Jaycox, or bringing him back in from the balcony.

To establish that the VA's *failure* to act was negligent, the Estate must show either a special relation, or that the VA caused the dangerous situation. As the Ohio Supreme Court has said, "there is no duty to act affirmatively for another's aid or protection absent some 'special relation' which justifies the imposition of a duty." *Estates of Morgan v. Fairfield Family Counseling Ctr.,* 77 Ohio St.3d 284, 673 N.E.2d 1311, 1319 (1997). Ohio courts have found "special relations" to exist for those who are "required by law to take . . . the custody of another under circumstances such as to deprive the other [person] of his normal opportunities for protection." *Clemets, Adm'x v. Heston,* 20 Ohio App.3d 132, 485 N.E.2d 287, 291 (1985). Clearly, neither Setty Home nor the VA exerted any control or custody over Jay-

cox, and the Estate has failed to show any other case law or statute that might establish a special relation.

■ Second, the Restatement explains that courts may find a duty to "take affirmative precautions" where one party's "prior conduct, whether tortious or innocent, may have created a situation of peril to the other." Restatement of the Law (Second), Torts § 314 cmt. a; *Hill v. Sonitrol of Southwestern Ohio, Inc.*, 36 Ohio St.3d 36, 521 N.E.2d 780, 784 (1988) (stating that Ohio has adopted § 314). In this case, there is no evidence that Brandyberry *caused* Jaycox to go out on the balcony. Because the burden is on the Estate to show that Brandyberry caused this dangerous situation (assuming it was in fact dangerous), the claim must fail.

### III

The Estate also claims that it was inappropriate for the district court to rely on depositions that were not filed properly. The district court opened its opinion with this explanation:

> The following statement of facts is taken from the complaint, motions for summary judgment, and the memoranda filed in connection with the motions for summary judgment. The Court notes that it could not consider all the evidence cited by the parties because none of the deposition transcripts to which they refer were filed with the Court. *See* Fed.R.Civ.P. 56(c); S.D. Ohio Civ. R. 5.4. The Court will, however, consider the deposition excerpts attached to the various memoranda because no party has objected to them.

■ It is well established that courts may consider deposition excerpts not filed in accordance with Federal Rule Civil Procedure 56, if the opposing party failed to object to them. *See Wiley v. United States*, 20 F.3d 222, 226 (6th Cir.1994) ("If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and we will review such objections only to avoid a gross miscarriage of justice."); *Rogers v. Benefits Servs. Agency*, No. 17374, 1996 WL 122088, 1996 Ohio App. LEXIS 1017, at *3–4 (Ohio Ct.App. March 20, 1996) ("Neither plaintiff nor defendants objected to the other's citation of deposition transcripts that were not properly before the trial court, and it is apparent from the trial court's order that it relied upon those transcripts. By not objecting, the parties waived their right to complain about the trial court basing its ruling on matters not properly before it."); *Molden v. Davey Tree Co.*, No. 89–T–4201, 1990 WL 115968, 1990 Ohio App. LEXIS 3212, at*7 (Ohio Ct.App. Aug. 3, 1990) ("When ruling on a motion for summary judgment, a trial court may consider documents other than those specified in Civ. R. 56(c) in support of the motion when no objection is raised by the party against whom the motion is directed.") (citing *Rodger v. McDonald's Restaurants of Ohio, Inc.*, 8 Ohio App.3d 256, 456 N.E.2d 1262 (1982)).

### IV

For the reasons stated above, we AFFIRM the judgment of the district court.